**Velia MONTOYA and Ricardo Montoya as next friend of Janette Montoya, and Patricia Blizzard and Paul Blizzard as next friend of Jenny Blizzard, Plaintiffs,**

v.

**Marlin W. JOHNSTON; Commissioner, State Office, Texas Department of Human Services; J. Livingston Kosberg, Vicky Garza, and Robert Mosbacher, Board Members of the Texas Department of Human Services, Defendants.**

Civ. A. No. A–87–CA–97.

United States District Court,
W.D. Texas,
Austin Division.

Feb. 23, 1987.

Marvin Rogers & Melinda J. Davis, West Texas Legal Services, Lubbock, Tex., and

William K. Kimble, West Texas Legal Services, Fort Worth, Tex., for plaintiffs.

Gus Lyons & Ana Pozo, Atty. General's Office, State of Tex., Austin, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

This action for injunctive relief came before the Court on February 18, 1987. Based on the admitted evidence, stipulations of fact and arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R. Civ.P. 52(a).

### I. *Factual Background*

The Plaintiffs, Janette Montoya and Jenny Blizzard, ages six months and six years respectively, both suffer from "end-stage" liver disease. As a result of the Plaintiffs' conditions, physicians have indicated that both children are in need of a liver transplant in order to survive. Presently, the cost of a liver transplant in Texas is approximately $200,000. Furthermore, those needing a transplant are not placed on an "active transplant list" unless a $100,000 prepayment is made or a private insuror or government benefits program guarantees payment for the transplant. Although both children are eligible for Medicaid, a problem has arisen in that the Texas Medicaid program will not pay more than $50,000 for the transplants. Effective July 1, 1986, the Texas Department of Human Services ("TDHS") placed a $50,000 cap on inpatient hospital expenses that Medicaid would pay for medical service for one person during a 12–month period. Plaintiffs have filed suit against the officials of the TDHS alleging that the $50,000 annual Medicaid cap functionally excludes liver transplants from Medicaid coverage and constitutes an arbitrary denial of services to otherwise eligible recipients. Specifically, the Plaintiffs base their claim on 42 U.S.C. § 1983 and allege violations of rights guaranteed under the Medical Assistance Program (Medicaid).

### II. *Legal Scheme*

The Medical Assistance Program (Medicaid), Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq. is a federal-state cooperative program providing medical assistance to indigent people. The cost of medical service is paid by the state, which is then reimbursed to the extent of 55% by the federal government. Each state writes its own plan, which must cover these five categories: (1) inpatient hospital services; (2) outpatient hospital services; (3) laboratory and x-ray services; (4) skilled nursing services; and (5) physicians services. 42 U.S.C. § 1396d(a)(1–5).

The federal government will not reimburse states for organ transplant procedures unless:

(1) ... the State plan provides for written standards respecting the coverage of such procedures and unless such standards provide that—

(A) Similarly situated individuals are treated alike, and

(B) *any restriction* on the *facilities* or *practitioners* which may provide such procedures, is consistent with the accessibility of high quality care to individuals eligible for the procedures under the State plan.

(emphasis supplied) 42 U.S.C. 1396b(i)(1).

In 1977, when the U.S. Supreme Court reviewed the issue of whether a state Medicaid plan could exclude funding for medically unnecessary abortions, the Court established a standard by which such plans are to be evaluated:

Although serious statutory questions might be presented if a state medicaid plan excluded necessary medical treatment from its coverage, it is hardly inconsistent with the objectives of the act for a state to refuse to fund unnecessary—though perhaps desirable—medicaid services.

*Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977).

Applying the principles articulated in *Beal* to this case, the issue becomes wheth-

er the Plaintiffs' liver transplants in this case constitute medically necessary treatment. If the Court finds that the transplants do constitute medically necessary treatment, it would be inconsistent with the objectives of the Act for Texas to refuse to fund the transplants. Therefore, before making a determination in this case, it is first necessary for the Court to determine what constitutes "medically necessary" treatment.

The Fifth Circuit addressed the meaning of "medically necessary" treatment in *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980). In *Rush*, the plaintiff brought an action to require Georgia to provide Medicaid funding for transsexual surgery. The district court ordered the state to pay for the surgery. The Fifth Circuit, however, reversed and held that the state may refuse to pay for the surgery if it can show: (1) that the surgery is experimental and/or (2) that the surgery is not medically appropriate. In the present case, therefore, this Court must determine that the liver transplants are not experimental and that they are medically appropriate before finding that the transplants are "medically necessary" within the meaning of *Beal.*

■ The Fifth Circuit in *Rush* provided a thorough definition of experimental surgery:

> The clearest articulation of the considerations that go into determining whether a particular service is experimental is found in a letter Medicaid uses to explain to its clients and providers why such a service is ineligible for reimbursement:
>
> > In making such a decision whether to provide payment for a particular service, a basic consideration is whether the service has come to be generally accepted by the professional medical community as an effective condition for which it is being used. It if is, Medicaid may make payment. On the other hand, if the service or treatment is not yet generally accepted, is rarely used, novel or relatively unknown, then authoritative evidence must be obtained that it is safe and effective before Medicaid may make payment.

*Rush*, 625 F.2d at 1156 n. 11. In this case, the Plaintiffs have submitted affidavits from the childrens' physicans which state that liver transplants are not considered experimental. As such, having reviewed the doctors' affidavits and having heard the argument of counsel, the Court finds that the liver transplants necessary to sustain the Plaintiffs' lives are not experimental.

Furthermore, the Court is of the opinion that the liver transplants in this instance are medically appropriate. The best indicator for determining the medical appropriateness of treatment rests with a patient's physician. *Rush*, 625 F.2d at 526. Dr. William Belknap, M.D., treating physician for Jenny Blizzard, states in his affidavit that "[h]er condition is critical. In my professional opinion, her chances of survival without a liver transplant are zero." Dr. Jane Goldthorn, M.D., attending physician for Janette Montoya, states in her affidavit that "[w]ithout the surgery, Janette's chances of survival are zero ... If Janette does not receive a liver transplant ... she will die." Clearly, it is evident that liver transplants for the Plaintiffs are medically appropriate and medically necessary under the standard set forth by the Supreme Court in *Beal.*

The Court will next address whether the Texas Medicaid program may prohibit treatment which has been found to be "medically necessary." The Court begins its analysis of this issue by noting that Medicaid regulations prohibit certain types of restrictions within state plans:

> The Medicaid agency may not arbitrarily deny or reduce the amount, duration or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness or condition.

42 C.F.R. § 230(c). The Court further notes that a state's refusal to provide medically necessary services has, on more than one occasion, been found to be arbitrary. *See Meyers v. Reagan*, 776 F.2d 241 (8th

Cir.1985); *Mitchell v. Johnston,* 701 F.2d 337 (5th Cir.1983).

In *Meyers,* the expert testimony was that the Plaintiff needed an electronic speech device to "communicate effectively." The panel held that once a state chooses to participate in an optional program (i.e., physical therapy), the state becomes bound by the federal regulations which govern the program. Therefore, the Eighth Circuit held that Iowa could not arbitrarily exclude electronic speech devices from the physical therapy portion of the Medicaid program. *Meyers,* 776 F.2d at 243–44.

The Fifth Circuit addressed a similar issue in *Mitchell v. Johnston, supra.* In *Mitchell,* the state of Texas cut back the amount of funds the Medicaid program invested in a preventive dental care program for children known as EPSDT. As a result of the cutback, eight basic dental services were eliminated and covered visits to dentists were limited. The issue in the case was whether Texas' program, after the cutbacks, provided the dental services in sufficient "amount, duration, and scope" to reasonably achieve the purposes of the federal Act. Affirming the district court's conclusion that the cutbacks violated federal law, the Fifth Circuit stated that "... since Texas voluntarily and knowingly entered into the cooperative program, fully aware of its requirements, it must bear the responsibilities and requirements of its participation." *Mitchell,* 701 F.2d at 351.

■ Likewise, in the present case, Texas voluntarily entered the federal Medicaid cooperative program and voluntarily recognized liver transplants as a covered service under Medicaid. Accordingly, Texas must comply with the federal standards which prohibit the arbitrary and/or unreasonable denial of services to otherwise eligible recipients. In this suit, the Court finds that the $50,000 Medicaid cap is arbitrary and unreasonable in that it functionally excludes the Plaintiffs' liver transplants from medicaid coverage. In support of its finding, the Court notes that Jenny Blizzard and Janette Montoya will not be put on an "active transplant list" unless a $100,000

down payment is made or a government benefits program guarantees payment for the transplants. If Medicaid were to guarantee payment, the final bill would be in excess of the $50,000 cap since liver transplants cost approximately $200,000. Therefore, if the Court did not allow the $50,000 limit to be exceeded in this case, the Plaintiffs would be ineligible to be put on the "active transplant list" and would be functionally denied Medicaid coverage although liver transplants are a covered item under the Texas Medicaid program and the Plaintiffs are eligible Medicaid recipients.

The Texas Department of Human Services opposes exceeding the $50,000 cap claiming that there are limited funds in the Medicaid budget and that funding these procedures diverts funds from less risky and more beneficial uses as far as total recipients are concerned. The Court, however, notes that in a recent fiscal year only 95 of the approximately one million Medicaid patients in Texas exceeded the sum of $50,000. Therefore, since only approximately .000095 percent of all Texas Medicaid claims previously exceeded the sum of $50,000 annually, it would appear that exceeding the limit in Plaintiffs' cases would only have an extremely minimal effect, if any, on the funds available for other recipients. As such, the Court is of the opinion that a greater benefit is achieved in permitting funding for the transplants than in refusing to exceed the $50,000 cap. Furthermore, the Court is also of the opinion that a temporary restraining order, and preliminary and permanent injunction should be immediately issued requiring the Defendants in their official capacities to take any and all necessary steps to effectuate liver transplants for Janette Montoya and Jenny Blizzard.

The final issue to be addressed by the Court is whether the Plaintiffs should be required to deposit a bond with the Court pursuant to Fed.R.Civ.P. 65(c). Rule 65(c) provides in pertinent part that:

"[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such

sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."

The Court notes that the requiring of security in each case rests within the discretion of the district judge. *City of Atlanta v. Metropolitan Atlanta Rapid Transit Authority,* 636 F.2d 1084, 1094 (5th Cir. 1981); *Corrigan Dispatch Co. v. Casa Guzman,* 569 F.2d 300, 303 (5th Cir.1978). In this action, the Court elects to not require any security from the Plaintiffs. Accordingly,

IT IS SO ORDERED.